IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| GAYLE A. JAYNES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV 05-3061-ST |
| v. | ) | |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of Social | ) | FINDINGS AND |
| Security, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Gayle Jaynes, brings this action for judicial review of a final decision of the

Commissioner of Social Security denying her application for disability insurance benefits

("DIB") under Title II of the Social Security Act. The court has jurisdiction under 42 USC

§ 405(g). The Commissioner concedes that her decision contains errors and moves the court to

remand for further proceedings (docket # 20). Jaynes opposes additional proceedings and seeks

a remand for an immediate award of benefits. For the reasons set forth below, the

Commissioner's decision should be reversed and remanded for an immediate award of benefits.

## BACKGROUND

Jaynes was born in 1955. Tr. 141.[1] She earned an Associate of Arts degree and worked many years doing heavy labor in a lumber mill, construction work, and road construction. Tr. 64, 199-204. After suffering a work-related injury to her right shoulder, she stopped working in July 1994. Tr. 66-67. She was diagnosed with severe major depression in October 1995. Tr. 287-94, 422. Jaynes had surgeries both on her left shoulder in August 1996 and on her right shoulder in February 1997, the cost of which was covered by her workers' compensation claim carrier.

Tr. 386-89, 394-97. In 1997 Jaynes was awarded permanent partial disability due to her shoulder impairments. Tr. 542-46.

After the shoulder surgeries, Jaynes suffered from neck pain and in 1998 was diagnosed with cervical spondylosis and foraminal stenosis, primarily at C5-6 and C6-7, with Tarlov cysts at multiple levels, and anterior defects. Tr. 493-99. However, her workers' compensation insurance carrier denied consent to perform a cervical diskectomy and donor graft fusion. That denial was based on differing medical opinions as to whether her condition was pre-existing and degenerative or caused by a work-related injury. Tr. 503-10, 533, 628-35.

Jaynes alleges disability for a closed period from July 15, 1994, to November 30, 2000, based on her shoulder impairments, injury or degenerative disorder in her cervical spine and

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer (docket # 8).

accompanying pain, and depression.  Tr. 653.  She satisfied the insured status requirements for

DIB benefits under Title II through December 31, 1999.  *Id.*

Jaynes applied for DIB on July 8, 1995.  Her application was denied and an

Administrative Law Judge ("ALJ") remanded her case back to the state agency for further

evaluation on November 27, 1996.  An initial administrative hearing was held August 31, 1998,

and a supplemental hearing was held on January 5, 1999.  The ALJ issued an opinion on

April 30, 1999, finding Jaynes not disabled, and she appealed to this court.  By stipulation of the

parties, the case was reversed and remanded to the Commissioner on July 23, 2002.  The

Appeals Council remanded the case to the ALJ on November 19, 2002, with instructions

additional to those in the court's remand Order.  Another administrative hearing was held on

January 11, 2005.  The same ALJ  found Jaynes was not disabled, which is the final decision of

the Commissioner.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability.  *Roberts v.*

*Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996) (citation omitted).  To

meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected . . . to last for a continuous period of not less than 12 months."  42 USC § 423(d)(1)(A).

The Commissioner has established a five-step sequential process for determining whether

a person is disabled within the meaning of the Act.  *Bowen v. Yuckert*, 482 US 137, 140 (1987);

20 CFR § 404.1520.  At step two, the Commissioner determines whether the claimant has a

medically severe impairment or combination of impairments.  An impairment is severe if it significantly limits the claimant's ability to perform basic work activities.  20 CFR § 404.1521(a).  Basic work activities are the abilities and aptitudes necessary to do most jobs.  20 CFR § 404.1521(b).  These include physical functions, such as seeing, hearing, speaking, walking, standing and sitting, and mental functions, such as understanding, remembering, using judgment and responding appropriately to work situations.  *Id*.  An impairment can be found "not severe" only if it is a minor abnormality that has no more than minimal effect on the claimant's ability to work.  *Smolen v. Chater*, 80 F3d 1273, 1290 (9th Cir 1996) (citations omitted).  The inquiry at step two is a *de minimis* screening tool to dispose of groundless claims.  *Id* (citation omitted).  The burden to show a medically determinable severe impairment is on the claimant.  *Yuckert*, 482 US at 146 n5.

Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 CFR Part 404, Subpart P, Appendix 1 ("Listing of Impairments").  If so, the claimant is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under step four.  20 CFR § 404.1520(d).

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC).  The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments.  20 CFR § 404.1545(a); Social Security Ruling (SSR) 96-8p.

4 - FINDINGS AND RECOMMENDATION

At step four, the Commissioner must determine whether the claimant retains the RFC to perform work he has done in the past.  If the ALJ determines that he retains the ability to perform his past work, the Commissioner will find the claimant not disabled.  20 CFR § 404.1520(f).   When the adjudication reaches step five, the Commissioner must determine whether the claimant can perform any work that exists in the national economy.  *Yuckert*, 482 US at 142; 20 CFR § 404.1520(g).  Here the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do.  *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999).  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR § 404.1566.

## THE ALJ's FINDINGS

The ALJ found that Jaynes had medically determinable impairments that significantly limited her ability to perform basic work activities.  He determined she had the severe impairments of "status post bilateral shoulder decompressive surgery and cervical spondylosis." Tr. 660.  However, the ALJ found her depression to be "non-severe," noting that "[s]he was not undergoing treatment from any mental health professional and had essentially returned to work, although not in a fulltime capacity."  *Id.*  After determining that Jaynes' condition did not meet an impairment listed in 20 CFR pt. 404, subpt. P, app.1, he assessed her RFC as follows:

> [T]he claimant retained the [RFC] to perform the exertional demands of limited light work, with limitation of use of the right extremity up to 10 pounds, and limited to and avoiding pushing or pulling up to 10 pounds.  Additional non-exertional limitations included the need to avoid use of the right hand for overhead work; avoid repeated flexion or extension to the extremes of the neck other than on an occasional basis; the need to work only at desk or eye level rather than requiring movement of the neck; and the need to avoid climbing or ladders.

Tr. 664.

5 - FINDINGS AND RECOMMENDATION

Based on this RFC, the ALJ found that Jaynes could not return to her past relevant work, but was able to perform work in the national economy. Tr. 665-66. He asked the impartial vocational expert ("VE") to identify Jaynes' employment following the closed period for disability, from December 2000 to 2005. The VE identified general office clerk, medical secretary, grocery checker, and insurance agent. Tr. 666. The ALJ then determined that "these jobs are commensurate with, and actually exceed the jobs identified by the vocational expert on January 5, 1999." *Id.* As a result, the ALJ concluded that Jaynes was not disabled within the meaning of the Act at any time from July 15, 1994 to November 30, 2000. *Id.*

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id* (citation omitted).

The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986) (citation omitted). The Commissioner's decision must be upheld, even if the evidence is susceptible to more than one rational interpretation. *Andrews*, 53 F3d at 1039-1040. However, if a district court remands a case with instructions, the Commissioner may not ignore the court's order. "Deviation from the court's remand order in the subsequent administrative proceedings is itself legal error subject to reversal on further judicial review." *Sullivan v. Hudson,* 490 US 877, 886 (1989).

## <u>DISCUSSION</u>

Jaynes asserts that the ALJ erred by failing to comply both with the instructions of this court's remand Order and the remand Order of the Appeals Council. This court's remand Order directed the ALJ to reevaluate the severity of Jaynes' mental impairment, the weight to be accorded to the medical source opinions, and the credibility of her subjective complaints. It further instructed the ALJ to obtain evidence from a VE and appropriately assess lay witness testimony, particularly the testimony of Charles Jaynes. Jaynes also contends the ALJ erred by not evaluating the combined effect of her physical and mental medical conditions.

**I.**    **<u>Delay</u>**

The Commissioner concedes that the ALJ failed to properly evaluate the severity of Jaynes' depression, to provide any reasons to reject the opinion of her treating physician (Dr. Alan J. Webb), to properly consider Jaynes' subjective complaints, to address the weight given to or provide reasons to reject the testimony of Charles Jaynes, to properly evaluate the other lay witness testimony, and to consult with a VE to clarify the effects of the assessed limitations on the occupational base. To correct these errors, the ALJ seeks an opportunity to assign this case to a different ALJ on remand. Specifically, a remand would allow a different ALJ to properly address the opinions of the treating and examining mental health sources; state the reasons for rejecting the opinion of the treating physician; further evaluate the credibility of Jaynes and the lay witnesses; and further consult with a VE.

Jaynes' application has been pending since 1995. The Commissioner has had two prior opportunities to properly evaluate her application and has failed both times. The Commissioner now seeks a remand that is substantively the same as the remand ordered by this court in 2002.

Furthermore, the remand Order of the Appeals Council suggested the ALJ re-contact treating sources or obtain the assistance of a medical expert.  There is no indication in this voluminous record that any medical experts or treating sources were contacted between the date of the Appeals Council remand Order of November 19, 2002, and the date of the administrative hearing on January 11, 2005.  In fact, the ALJ noted the long delay between the remand Order and the hearing, but stated at the hearing that he had "no clue, quite frankly, why this file didn't come back."  Tr. 704.

This court has recognized that a remand for an immediate award of benefits is appropriate when the Commissioner's errors result in a long delay in reaching a claimant's DIB claim. *Kennedy v. Apfel,* 2000 WL 913690 * 4 (D Or 2000), citing *Ragland v. Shalala,* 992 F2d 1056, 1060 (10th Cir 1993) (it is proper to exercise discretionary authority to remand for an immediate award of benefits when there has been long delay due to the Commissioner's errors). The Commissioner's errors have resulted in significant delays in this case.  That long delay alone is a sufficient reason to remand for an award of benefits.  In addition, as discussed below, a remand for an award of benefits is supported by other reasons.

II.     **Credibility Determination**

A.     **Medical Background**

Jaynes was involved in a protracted workers' compensation claim concerning the scope of her on-the-job injury.  The record contains conflicting medical opinions between treating and examining sources, particularly with respect to the pain and limitations imposed by her shoulder injuries.  After the surgeries occurred on both shoulders, an MRI and CT scan revealed cervical spine disorders.  Although consultants for the workers' compensation carrier agreed with Jaynes'

treating neurosurgeon regarding her cervical spondylosis, disagreement ensued regarding whether it was a pre-existing condition.  However, that is not the relevant issue here.  For purposes of DIB, the issues are the physical limitations caused by the condition, and the functional limitations due to pain, medication side effects, and mental impairments.

Jaynes reported an injury to her right shoulder on June 2, 1994, while cleaning a rock crusher at a job site.  Tr. 237.  After her supervisor told her "to get tough," she took 35 ibuprofen tablets a day and continued working until July 15, 1994, when she began treatment with Dr. Webb, an orthopedic surgeon.  Tr. 238.  Dr. Webb gave her a corticosteroid injection and diagnosed right shoulder tendinitis and subacromial bursitis.  Tr. 264.  Two weeks later, Dr. Webb found positive right shoulder impingement and scheduled and arthrogram.  Tr. 265. When Jaynes reported increased pain, Dr. Webb prescribed Naprosyn and physical therapy ("PT").  Tr. 266-67.

Jaynes returned to her road construction work for one day in mid-September 1994 and stated that her supervisor required her to hold a flag in her left hand all day to avoid any re-injury to the right shoulder.  Tr. 238.  She returned to Dr. Webb reporting increased pain in her right shoulder, as well as new pain in her left shoulder.  *Id.*  He diagnosed left rotator cuff tendinitis, subacromial bursitis, and bicipital tendinitis and obtained a positive test result for impingement. Tr. 266.  Dr. Webb prescribed PT and continued her prescription for Naprosyn.  Tr. 267-68. Notes from the physical therapist indicate upper back myofascitis and decreased cervical range of motion.  Tr. 256.  Aggressive PT treatment resulted in increased pain.  Although she made no gains in strength, Jaynes was consistent and cooperative in her treatment regime which lasted two months.  Tr. 252-61.

When Jaynes complained of increased pain in October 1994, Dr. Webb gave her a corticosteroid injection in the left shoulder and noted crepitance and little improvement in the right shoulder.  Tr. 268-69.  Dr. Stephen Fuller, a consulting orthopedic surgeon for the workers' compensation carrier, examined Jaynes in November 1994 and opined that her pain was subjective and she had no impairment.  Tr. 237-40.

In December 1994, Dr. Webb prescribed Voltaren for continued pain in the right shoulder.  Tr. 270.  Dr. Webb noted continued bilateral shoulder pain and crepitance in April 1995 and referred her for a Level II physical capacities test.  Tr. 271-72.  The July 27, 1995 physical capacities test indicated limitations on overhead reaching, crawling, and crouching and demonstrated a sedentary to light work level.  Tr. 262-63.  The examiners noted that Jaynes was taking 20 ibuprofen tablets a day for pain and was cooperative with the testing, but Jaynes reported stiffening and increased pain following the testing.  *Id*.

In August 1995, Dr. Webb found "quite positive" impingement of the left shoulder and positive impingement of the right shoulder, gave Jaynes a corticosteroid injection, and recommended surgery.  Tr. 273.  On August 27, 1995, during her physical at the Klamath Falls Health Center, Jaynes reported taking 30-35 tablets of 200 mg ibuprofen a day and stated that surgery on her shoulders could not be performed until her workers' compensation claim was settled.  Tr. 274.  She was given a prescription for Daypro and informed of the side effects of high doses of ibuprofen.  Tr. 275.

Jaynes began treatment at Klamath Falls Mental Health Center ("MHC") on October 5, 1995.  Tr. 284-86.  She was treated by Dr. Walter Koursky, a psychiatrist, and received therapy from counselors who were supervised by a psychologist.  Tr. 287-98.  Jaynes was diagnosed

with severe major depressive disorder, recurrent, with suicidal ideation, insomnia, and a Global

Assessment of Functioning of 50.[2]  Tr. 292.  Medical notes indicate a past suicide attempt that

resulted in psychiatric hospitalization.  Tr. 285.  Jaynes also described unusual thoughts,

isolation, low motivation, chronic pain, sleep problems, angry outbursts, no enjoyment and

difficulty remaining focused.  Dr. Koursky prescribed Paxil and noted Jaynes was taking Daypro

for pain.  Tr. 284-94.  Treatment notes from MCH describe severe depression, severe suicidal

ideation, no immediate recall, no emotional control, anxiousness, fearfulness, and some

obsessions.  Tr. 290-92.  By December 1995, her therapy team noted that the Paxil had decreased

her depression, but the side effects were confusion and "loses train of thought."  Tr. 296.

Dr. Koursky decreased her dosage of Paxil on December 12, 1995.  *Id.*

On December 21, 1995, Dr. Martin Kehrli, a state agency consultant, reconfirmed an

original RFC which determined Jaynes had shoulder pain and major depressive disorder

secondary to chronic pain.  Tr. 162-73.  An RFC of mental functioning noted moderate

functional limitations on activities of daily living, maintaining social functioning, attention,

concentration, persistence and pace with a few episodes of decompensation in a work-like setting

which caused withdrawal or exacerbation of symptoms.  Tr. 173.  The RFC also noted that due

to concentration issues, only short, repetitive tasks and simple instructions were appropriate.

Tr. 165.

Dr. Ron Turco, a consulting psychiatrist for the workers' compensation carrier,

conducted a psychological exam on March 20, 1996, and doubted any physical problem.  Tr.

---

[2]  A GAF of 41 to 50 indicates serious symptoms (suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social occupational, or school functioning (*e.g.*, few friends, unable to keep a job). The American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 34 (4th ed. 2000).

353-57.  He diagnosed mild depressive reaction, passive aggressive personality tendencies with hysterical/hypochondrial features and "strongly suspect[ed] psychological issues that are producing physical complaints."  Tr. 357.  His colleagues, Drs. Robert McKillop and Gerald Reimer, conducted an orthopedic exam.  Tr. 358-65.  They noted Jaynes had poor memory, symptoms out of proportion to objective findings, a flat affect, and seemed somewhat depressed. Tr. 363. They did not agree with Dr. Webb's  recommendation for surgery because of "non-organic psychiatric problems" that were concurrent with some pathology in her shoulder, and believed she was "probably capable of light work."  Tr. 364-65.

On June 24, 1996, Dr. Webb noted that radiographs indicated a Type 2 acromian and adhesive capsilitis of Jaynes' left shoulder.  Tr. 410.  He performed surgery on her left shoulder including a decompression and resecting of the coracoacromial ligament and subacromial bursectomy on August 13, 1996.  Tr. 386-89.  The surgery and post operative physical therapy were fairly successful and greatly reduced her left shoulder pain.  However, Jaynes complained of increased pain in her right upper back and shoulder and radiographs indicated a Type 2 acromian in her right shoulder.  Tr. 414-15.  Dr. Webb performed surgery on her right shoulder on February 4, 1997, for rotator cuff tendinitis and subacromial bursitis.  Tr. 394-97.  However, post-surgery, Jaynes complained of numbness in her hands and fingers and significant pain radiating from her neck.  Tr. 396, 415-17.

MHC treatment notes through April of 1996 indicate a continued GAF of 50, suicidal ideation and mood swings which prompted Dr. Koursky to change her medication to Effexor. Tr. 429-37.  In June 1996, Jaynes' therapy team at the MHC added the diagnosis of pain disorder associated with both psychological and medical factors, chronic.  Tr. 443.  Jaynes' mood

improved before her left shoulder surgery on August 13, 1996, however, her psychiatrist

recommended she stop taking Effexor for the surgery, which caused her to become "unstable

emotionally." Tr. 450.  Dr. Koursky recommended continuation of Effexor during the surgery

for her right shoulder.  *Id.*  Jaynes continued to receive treatment at the MHC, and by December

1996, her depression improved, although she still had poor concentration and memory, with a

depressed mood and blunted affect.  Tr. 418-20.

On March 20, 1997, Dr. Stephen Tibbits, PhD, a consulting psychologist for the state

agency, diagnosed mood disorder due to chronic pain with major depressive disorder, a GAF of

52,[3] and noted moderate difficulty in occupational functioning.  Tr. 403-05.  He also noted

Jaynes had difficulty with memory and new learning, and was not able to drive, clean her house,

or manage finances.  Tr. 405.  Dr. Tibbits further noted that Jaynes was "somewhat compromised

in independence, appropriateness, and persistence" with activities of daily living.  *Id.*  Jaynes

continued treatment at MHC until her counselor moved away in 1997 and remained on anti-

depressant medications. Tr.  421.

Dr. Webb determined the surgery was not successful on the right shoulder after PT and

corticosteroid injections failed to improve the pain and functioning.  Tr. 485, 491-92.  He noted

she would have permanent restrictions, a partial permanent disability, and that further surgery

and a referral for cervical spine disease may be necessary.  *Id.*  Dr. Webb referred Jaynes to

Dr. Michael Potter, a neurosurgeon.  Tr. 493-94.

---

[3]  A GAF of 51 to 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or any moderate impairment in social occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). The American Psychiatric Association,  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 34 (4th ed. 2000).

In September 1997, Jaynes was awarded workers' compensation for a permanent partial disability due to her shoulder injuries.  Tr. 542.

In October 1997, Dr. Potter  prescribed Vicodin and Robaxin for her neck and ordered an MRI and C-spine x-ray.  Tr. 494.  Following abnormal results from the MRI, Dr. Potter ordered a myelogram and CT scan.  Tr. 496, 459.  On December 18, 1997, Dr Potter found that the tests indicated cervical spondylosis and foraminal stenosis, primarily at C5-6 and C6-7, Tarlov cysts at multiple levels, and anterior defects at C6-7 and C5-6.  Tr. 459, 497-99.  He recommended a cervical diskectomy and donor graft fusion of C5-6, C6-7 with anterior instrumentation.  Tr. 459.

Dr. Daniel Hanesworth provided a Medial Arbiter Report for the workers' compensation Appellate Review Unit on January 6, 1998.  Tr. 500-02.  He opined that Jaynes could lift less than 10 pounds with the right arm but could not do overhead reaching, climbing, pulling or pushing with the right arm and shoulder, and noted that her cervical spine and right shoulder issues "may need further clarification."  Tr. 501.  Drs. Holm Neumann and John Melson, who performed an orthopedic/neurologic exam on January 26, 1998, concurred with Dr. Potter's diagnosis of cervical spondylosis, but believed it was a pre-existing condition and not related to a work injury.  Tr. 503-10.  They noted unusual findings in Jaynes' neck and the need to rule out tumor pathology.  Tr. 508.  They believed that any limitations on working were related to pre-existing degenerative changes.  *Id*.

On February 13, 1998,  Jaynes' workers' compensation file was closed on reconsideration with no award for a neck impairment.  Tr. 542-46.  Through the workers' compensation system, Jaynes then became eligible for required vocational training on January

29, 1998, and was assessed with no transferable skills for her determined level of sedentary

work.  Tr. 512-20.

Dr. Potter continued treating Jaynes and in May 1998 switched her pain medication from

Percoset to Duragesic due to side effects which made her "too drugged."  Tr. 539.  In July 1988

Jaynes requested Dr. Potter to release her to perform the vocational training that was required as

part of her workers' compensation claim.  *Id*.  In response, Dr. Potter noted "some serious

concerns about her ability to complete the study because of her pain problem and the

concentration difficulties that occur with chronic pain problems like this, but I have signed off on

it.  If it does not work, we can always back off."  *Id*.

On July 17, 1998, Dr. Thomas Rosenbaum, a consulting neurosurgeon for the workers'

compensation carrier, disagreed with Dr. Potter's recommendation for surgery, finding more

muskuloskeletal involvement.  Tr. 628-35.  He also diagnosed probable significant functional

overlay of the cervical condition with shoulder issues, further opined that the cervical pain was

caused by degenerative arthritis and not nerve impingement, and stated that the condition was

pre-existing and not related to her job injury.  *Id*.

Jaynes' medications chart dated December 12, 1998, indicates continued prescriptions for

Effexor, Hydrocodone and MS Contin.  Tr.  636.  Jaynes testified at her hearing in 1998 that she

was committed to try to complete the vocational training in order to get a job with health

insurance to pay for her neck surgery, as the workers' compensation claim would not cover it.

Tr. 88.  In order to decrease her concentration problems, Dr. Potter switched her pain medication

to Robaxin and Loratab, and she used a TENS unit while studying.  Tr. 71-73.

Jaynes testified at the 1999 hearing that she was unable to complete the vocational training course of study in the allotted time. Tr. 107-08. She was placed in a job training program where she worked with an insurance manager one or two days a week. *Id*. If she was in too much pain to work, she was able to cancel her appointment and work another day. *Id*. She was taking MS Contin for pain and testified her maximum capacity for work or training was 15 hours a week. Tr. 119-20. At the hearing in 2005, Jaynes testified that she was placed at a local cemetery in 2000 to learn general office skills. Tr. 709-11. She further stated that in November 2000, her sister "talked to her boss" about a job as a medical unit secretary on the night shift, a position that had been open for a long time. Tr. 711-12. Jaynes testified that the hospital gave her a "about a year" to learn the position and ease into a regular work schedule. *Id*.

### B.    <u>Analysis</u>

The ALJ was ordered on remand to reevaluate the credibility of Jaynes' subjective complaints. The ALJ must assess the credibility of the claimant regarding the severity of symptoms only if the claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms. *Smolen*, 80 F3d at 1281-1282 (citation omitted). It is undisputed that Jaynes has medically determinable impairments which could produce her symptoms.

When there is an underlying impairment and no evidence of malingering, an ALJ may discredit a claimant's testimony regarding the severity of symptoms only by providing clear and convincing reasons based on specific findings. *Smolen*, 80 F3d at 1283-84, citing *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993). There is no evidence of malingering in this case. To the contrary, Jaynes had a long work history before her injury and the vocational counselor noted

her history of "excellent work ethic." Tr. 606. She made consistent efforts to follow her physical therapy and comply with medical treatment. She undertook vocational training against her physician's advice because of her desire to get a job and health insurance. Finally, after the closed period, she found a work site to accommodate her limitations until her condition improved.

If an ALJ finds a claimant is not fully credible, the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill*, 12 F3d at 918 (citation omitted). The ALJ may consider objective medical evidence and the claimant's treatment history as well as any unexplained failure to seek treatment or follow a prescribed course of treatment. *Smolen,* 80 F3d at 1284. The ALJ may also consider the claimant's daily activities, work record and the observations of physicians and third parties with personal knowledge about the claimant's functional limitations. *Id.* In addition, the ALJ may employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid. *Id*; SSR 96-7p.

The ALJ found Jaynes' credibility "limited" as "the majority of physicians who examined claimant during the relevant period concluded that she was able to perform some level of work." Tr. 664. However, it is clear that the physicians examining Jaynes from 1994 to 1998 were not considering her cervical spine condition. As Dr. Potter stated on April 2, 1998:

> This is a classic type of a response to a problem that, in my opinion, was inadequately worked up in the first place. The scenario is as follows. The patient has a problem in the shoulder, neck girdle area and goes to an orthopedist. An orthopedist, who is more familiar with problems in the shoulder region, works up what they think is a shoulder problem, and in this case may have actually had one and

eventually underwent surgery. During this time part of her problem is related to her neck and understandably she does not get adequate relief from shoulder surgery. Eventually she is referred to someone who does cervical spine surgery, a proper diagnosis is made, and the insurance companies wish to hold the patient to the original diagnosis that was made, that of a shoulder problem, ignoring her cervical spine problem. I do not agree with the doctors' conclusion, her history sounds like she had a cervical spine problem with radicular pain into the arms related to her herniated disk all along. I think it was left out of the diagnosis, there may have been some pre-existing cervical spondylosis, but I think it was just a problem that was missed and is now being addressed. Understandably, the insurance company wishes to avoid responsibility for it.

Tr. 533.

Dr. Potter's diagnosis of cervical spondylosis is uncontroverted. Dr. Potter did not directly address Jaynes' ability to work, but expressed serious concern about whether she could handle even a part-time vocational training program due to pain and concentration difficulties. Drs. Neumann and Melson, the consultants for the workers' compensation carrier, disagreed with Dr. Potter regarding the causation and treatment of her neck definition, but opined that "she cannot do her regular work at the present time. We recommend that further evaluation be made in regard to her condition before recommending any specific work restrictions." Tr. 509. Dr. Rosenbaum, a consulting neurosurgeon, diagnosed  probable significant functional overlay of the cervical condition and the shoulder issues. Although he disagreed with some of Dr. Potter's findings and the need for surgery on the basis that her neck issues were not related to her work injury, he did not comment on her ability to work.

At each of the hearings in 1998, 1999, and 2005, Jaynes testified that she was unable to work during the closed period because of extreme pain and significant concentration and memory problems. Tr. 71-74, 85-88, 109-10, 113-14, 119-20, 712-13. Dr. Potter's diagnosis of

her cervical spine condition supports her testimony regarding pain.  The medical records indicate that in addition to anti-depressants, she took numerous pain medications throughout the closed period.  Tr. 113, 265, 270, 274-75, 285, 332, 450, 494, 537, 539, 636.

The medical record also supports Jaynes' testimony of significant concentration and memory problems.  The record includes notes on these problems by the mental health team at MHC (Tr. 290-97), the consultants for the workers' compensation carrier, Drs. McKillop and Reimer (Tr. 363), the state agency consultants, Drs. Kehrli and Tibbits (Tr. 303-12, 403-05), and the treating neurosurgeon, Dr. Potter (Tr. 539).

Jaynes' testimony is further supported by the testimony of her husband, Charles Jaynes, who testified that she was unable to drive the car as she "cannot handle it mentally or physically."  Tr. 95.  Mr. Jaynes stated that his wife was not "rational" in a lot of her thinking and distracted.  *Id*.  He testified she was unable to do many activities of daily living without assistance.  Tr. 95-96.  He described her struggle with the vocational training program, stating she was trying very hard, but information was "not sticking."  Tr.  96.

The ALJ failed to provide clear and convincing reasons based on specific findings for rejecting Jaynes testimony regarding pain and problems with concentration and memory.  Furthermore, the record contains substantial evidence supporting Jaynes' testimony.  When an ALJ errs in rejecting a claimant's symptom testimony, and "the claimant would be disabled if his testimony were credited, 'we will not remand solely to allow the ALJ to make specific findings regarding that testimony.  Rather, that testimony is also credited as a matter of law.'" *Lester v. Chater*, 81 F3d 821, 834 (9th Cir 1995) (internal citation omitted).

## III.    Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir), *cert denied*, 531 US 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen,* 876 F2d 759, 763 (9th Cir 1989) (citation omitted).

Improperly rejected evidence should be credited and an immediate award of benefits directed where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Harman*, 211 F3d at 1178, citing *Smolen*, 80 F3d at 1292.

The ALJ failed to provide legally sufficient reasons for rejecting Jaynes testimony and it is clear from the record that the ALJ would be required to find her disabled if her testimony was credited. Jaynes and the Commissioner raise issues concerning other errors on the part of the ALJ. However, these issues need not be reached as the improperly rejected testimony of Jaynes establishes her disability during the closed period.

///

## **RECOMMENDATION**

Based on the foregoing findings and conclusions, the Commissioner Motion to Remand (docket #20) should be GRANTED IN PART and DENIED IN PART. The Commissioner's

20 - FINDINGS AND RECOMMENDATION

final decision should be reversed and remanded for an award of benefits and final judgment should be entered pursuant to sentence four of 42 USC § 405(g).

### SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due September 1, 2006. If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 14th day of August, 2006.

/s/ Janice M. Stewart __
Janice M. Stewart
United States Magistrate Judge